## CICERO BUFORD v. STATE.

No. A-4398.   Opinion Filed May 9, 1924.
(225 Pac. 568.)

(Syllabus.)

1. **Larceny—Evidence Sustaining Conviction.** Evidence reviewed, considered, and held sufficient to sustain the verdict and judgment.

2. **Larceny—Burden of Proof as to Truth of Explanation of Possession of Stolen Property.** The onus of proving the truth of his explanation is upon one in whose possession stolen property is found, when found under such circumstances as to call for an explanation, and the explanation given is not natural and probable, and not such as all reasonable minds would agree on.

Appeal from District Court, Washington County; J. R. Charlton, Judge.

Cicero Buford was convicted of the crime of grand larceny, and his punishment fixed at imprisonment in the state penitentiary for 2½ years, and he appeals. Affirmed.

On the 17th day of August, 1920, the county attorney of Washington county filed in the district court of said county an information charging the plaintiff in error, Cicero Buford, hereafter referred to as defendant, with the crime of grand larceny, alleged to have been committed on the 16th day of July, 1920, by stealing one K. C. door, painted lead color on the outside and white on the inside, and of the value of $6, one five-panel cross-bar door, painted natural wood color on one side and white on the other side of the value of $6, five full two-sash windows, all painted natural white color on the inside and black on the outside and of the

value of $35, five screens to fit said windows of the value of $20, and all of such property of the aggregate value of $67 and the personal property of the Delaware Cherokee Oil Company, etc.

After the issues were formed and a continuance of the trial had on the application of the defendant, the cause came on regularly for trial on the 5th day of January, 1922, pursuant to an assignment theretofore made, when both sides announced ready for trial and a jury was called and impaneled and sworn. A verdict of guilty was returned with punishment fixed as above stated.

The evidence is substantially as follows:

"H. J. Lisle, a witness for the state, testified that in July, 1920, he was working for the Delaware Cherokee Oil Company, looking after their interests for pumping a part of their leases; that on the 16th day of July, the said Delaware Cherokee Oil Company were the owners of some windows, doors and screens, which were kept in a house that the company bought from the Mid-Continent Company in Washington county, Oklahoma; that said property was on said premises on the 15th day of July, 1920, and was missed on the morning of the 16th, on Friday; that witness immediately reported said loss to the sheriff of Washington county; that witness next saw said property on some premises in the north part of the city of Bartlesville, where the defendant and two other men were engaged in building a house; that defendant was hanging one of the doors in the house he was building when the property was discovered (witness then proceeded to describe the property and to testify to the value thereof); that Mr. Creed, a deputy sheriff, and Mr. Eakin were with him when the property was discovered.

"Witness then details what occurred as follows: 'Well, Mr. Creed came up to Mr. Buford and spoke to him and asked him, if it was a fair question, whose house that was, and Mr. Buford said it was his, and Mr. Creed asked him, if it

was a fair question, where he got those doors and things, and Mr. Buford said that he had had them for a long time, and Mr. Creed told him that there was some stuff that had been taken from out here in the country and that we were looking for it, and "these fellows claim this stuff," and then Mr. Creed asked Mr. Buford would he show him (Creed) where he (Buford) got that stuff, and Buford says, "I have had it for a long time," and Mr. Creed asked him something else about it, and Mr. Buford's answer was the same—"I have had it for a long time." Q. Did Mr. Creed arrest him at that time? A. Yes, sir.' "

On cross-examination the witness testified in part as follows:

"Q. Do you remember specifically just what property Mr. Creed mentioned to him (Buford)? A. Yes, sir; doors, windows, and screens. Q. Were there any other doors, windows, or screens there, Mr. Lisle? A. Not that I saw. Q. The property that you claim as belonging to your company, none of that stuff had been used there—had been installed in that house of Buford's, had there? A. Yes, sir; some of the window frames were in. Q. How many window frames do you remember were in? A. I think he had two of them in, and three more sitting there to be put in. Q. I mean your sashes? A. Yes, sir. Q. How many window openings were there in Mr. Buford's house? A. Five. Q. How many door openings? A. Two. Q. He was just building that house, was he? A. Yes, sir. Q. What time was it that you got down there and found this property? A. On Monday afternoon."

Clyde Eakin, a witness for the state, testified substantially as did the witness Lisle.

J. J. Creed, deputy sheriff, a witness for the state, testified in part as follows:

"Q. Did you arrest the defendant here? A. Yes, sir. Q. I will ask you to tell where you arrested him? A. On North Park avenue—I forget the number. Q. Who went out

there with you? A. Messrs. Lisle and Eakin. Q. H. J. Lisle and Clyde Eakin? A. Yes, sir. Q. Was there some property there that was identified by Mr. Eakin and Mr. Lisle? A. Yes, sir. Q. What did that property consist of, if you remember? A. Five screens, five windows, and two doors. Q. Did you have any conversation with the defendant there at that time? A. Yes, sir. Q. About this property? A. Yes, sir. Q. Tell the jury what that conversation was about? A. Well, when I went in I spoke to him and asked him where he got those doors, windows and screens, and he said, 'I have had them a long time.' Well, I said, 'Could you tell me where you got them?' and he said, 'I have had them a long time', and then I turned around to Lisle and Eakin and asked them if they could identify that property, and they said, 'Yes,' and I asked them how, and Mr. Lisle said that the first time the windows were painted they were stained brown and one white, and then he spoke about a crack on one of the screens —one side, and he told about the name of this door, and said on the inside of one of the doors we would find a couple of tacks and a string across there where a curtain had been hanging. Q. Had you informed the defendant that some doors, windows and screens had been stolen? A. Yes, sir. Q. Did you have any further conversation with him after you had asked him the first few times? A. Yes; I asked him if he would go with me and show me where he had gotten that stuff, and he simply replied that he had had it a long time, and I then said, 'Will you tell me where you got it so that I can go and find out about it?' and he made the remark again, 'I have had it a long time.' Q. Who else was there besides the defendant? A. Tom Stapp and Joe Crittenden. Q. Did the defendant say anything about them? A. When I asked him, he said that the house was his. Q. Did he say anything about those two men? A. No, sir. Q. To refresh your recollection, didn't he say that those two men didn't have anything to do with it? A. I asked Joe Crittenden, and he said that they were just working there for Buford, and then Buford spoke up and said that they were just working for him. Q. Were there any other doors, windows, or sash there? A. No, sir.''

Defense.

Cicero Buford, defendant, testified in part as follows:

"Q. Where were you living a year ago last—on the 16th day of July, 1920? A. I was living at the Gladstone hotel at that time. Q. Where had you been living prior to that? A. On the farm out here a short ways—a few miles. Q. Where had you been previous to that time? A. I had been backwards and forwards—a few days in town and back to the farm. Q. Had you been away from here? A. No, sir. Q. Were you in the service? A. Yes, sir. Q. Went across? A. Yes, sir. Q. Did you get an honorable discharge? A. Yes, sir. Q. Are you married? A. No, sir. Q. Were you married at that time? A. Yes, sir. Q. You have heard the testimony that has been offered here about Mr. Creed and those other gentlemen finding some stolen property at your place? A. Yes, sir. Q. Where is that place located? A. On North Park avenue. Q. Here in Bartlesville? A. Yes, sir; about two blocks west and about a block north of the ice plant. Q. What were you doing down there? A. Building this house on the lot there. Q. Who was helping you? A. Tom Stapp and Joe Crittenden. Q. How long had you been engaged in the building of that house at the time this happened—at the time this property was found out there? A. Ten or fifteen days, something like that. Q. Did you have some doors, sash, and screens out there? A. Yes, sir. Q. Did you own any other property of a like kind at that time? A. Yes, sir. Q. Where was it located? A. In Osage county, on the farm. Q. How far is that from the lot on which you were building this house? A. Twelve or fifteen miles. Q. When you started this house that you were building, what were you going to do for doors, sash, etc.? A. I was going to bring this in from the farm. Q. Where did you get the doors, sash, and so on that Mr. Creed found out there? A. Why, a fellow drove up to my house, about 8 or 9 o'clock, shortly after we had commenced work and 'hollered,' and I went out to see who it was, and he wanted to know if I could use any property of that kind—he had these doors and stuff on a little spring wagon, and I climbed up on the wagon and looked it over and asked him what he wanted for it, and he told me that he

wanted $40 for it, and so I told him I would give him $35 for the stuff, and he turned to this other fellow and says, 'Well, you better take it.' Q. Who did he tell that to? A. To this colored fellow— there was a colored man on the wagon with him. Q. Was there two of them? A. Yes, sir. Q. Did they both drive up there together? A. Yes, sir. Q. Well, did you buy that stuff? A. Yes, sir. Q. Who were you talking to—the white man or the negro? A. The white fellow was talking to me, but he said that the colored fellow owned the stuff. Q. And he said to the colored fellow 'You'd better take it?' A. Yes, sir. Q. Did you inquire what their names were? A. Yes, sir; I asked their name, and I think he said this colored fellow's name was Penny, but I don't remember now what the other fellow's name was. Q. Did you ask him anything about where he lived? A. Yes, sir. Q. What was his reply? A. He said he lived near the planing mill. Q. Did you ask him where he got this stuff? A. Yes, sir. Q. What did he say? A. He said he bought them from a fellow that was repairing a house and using new fixtures and heavier fixtures. Q. You say you finally bought that stuff? A. Yes, sir. Q. Where did you get the money? A. I had $20 and borrowed $15 from Tom Stapp. Q. What did you do with that stuff after you bought it? A. Piled it right there on the outside of the house, and that evening when we got ready to quit we piled it in the house. Q. Was there any effort made to conceal it, or anything of that kind? A. No, sir. Q. When was that with reference to the time that Creed and these other gentlemen came over there? A. About two days later. Q. You mean they came about two days later—two days subsequent to the time you bought the stuff? A. Yes, sir. Q. Do you remember the conversation that you had with Mr. Creed? A. Well, he asked me whose place that was and I told him it was mine, and he said something about where did you get your doors and windows, or something like that—

"Mr. Ray: Speak up louder.

"He asked where I got my doors and windows, so I didn't know who those fellows were that were with him, just knew Creed, and he didn't explain his business, and I just told him I had had them a long time, and he said, 'Can you

tell me where you got them,' and I still told him I had had them for a long time, and he said, 'I will have to arrest you,' and I said, 'All right.' Q. Do you remember whether you stated, 'I had them' or 'I have had them a long time?' A. I believe I stated 'I have had them a long time,' or something like that, I don't remember exactly—I would not be positive about that.''

On cross-examination defendant testified in part as follows:

''Did you have any horses and wagons? A. Yes, sir. Q. Where is this farm that you own located? A. About 12 or 15 miles out in Osage. Q. That is where those windows and things that you say you owned were? A. Yes, sir. Q. How do you get from Bartlesville out to your farm—did you have a car? A. No, sir. Q. How did you travel? A. We generally rode horses, or come over to O'Keefe and came in on the train. Q. You were back and forth to your farm two or three times a week, were you? A. Not at this present time I was building that house; I had been in here probably for a month at that time. Q. And hadn't been back to that farm? A. Yes, sir; I had been back. Q. How long before the 16th of July, 1920? A. I don't exactly remember. Q. A short time? A. Yes, sir. Q. Do you mean to tell this jury that you had all of those doors, screens, and windows at your place— down at your farm, already torn down, and you had wagons and horses there, and still you would pay $35 to keep from hauling them 12 or 15 miles? A. Yes, sir. Q. What was the name of this white man that you say was with the negro from whom you bought that stuff? A. It was a funny name— I don't remember now. Q. What was the negro's name? A. Penny, I believe—Penny was the negro's name, as well as I remember. * * * Q. And he told you what? A. He told me he bought it at a bargain south of town from some fellows who were repairing a house—some men out in the country south of town. Q. He said he had bought it from some man out in the country, south of town? A. Yes, sir. Q. Did he say who it was? A. No, sir. Q. Did you ask him who the man was that he claimed to have bought this property from? A. No, sir. Q. Why didn't you? A. I don't know. Q. But

you tried to find out if he was the rightful owner of it? A. Yes, sir. Q. But you didn't ask who he got the stuff from—who he bought it from? A. No, sir. Q. You didn't ask him how far south of town the party lived from whom he bought it either, did you? A. No, sir. * * * Q. You made an affidavit in this case last October, didn't you? A. Yes, sir. Q. Didn't you swear in that affidavit that it was on the 15th day of July, 1920, that this white man and negro came to your place and sold you this stuff? A. I believe I did. Q. Well, did you? A. Yes, sir. * * * Q. Then it was on the 15th day of July, 1920, that you bought that stuff? A. I believe it was; I don't exactly remember the date now. Q. But that is the date on there, and that is the date—well, you see it says it was on the 15th day of July, 1920, that they came to your place? A. Yes, sir. Q. And that is right? A. Yes, sir. Q. That is the date that you bought those things? A. Yes, sir.''

Tom Stapp, a witness for the defendant, testified that he had been assisting defendant in constructing the house and that defendant had bought the doors, windows and screens, and in this connection testified as follows:

''How did Buford come to buy that stuff? A. Well, we were working there, and he had to have some doors, and he had been telling me all the time that he had some back at his brother's on the farm, and we were just working along there, and those two fellows drove up in a one-horse wagon and hollered, and Cicero and Joe went out there, and pretty soon he called me out there and asked me what I thought about that stuff, and I asked him the price and he said $40, and we talked on a little about it being pretty good stuff, and Cicero said he didn't have enough money to buy it, and finally this fellow said he would take $35 for it, so he had $20 of his own, and I loaned him the $15, and he bought it. Q. Was there any time during that conversation there that you heard the names of those parties from whom Cicero got this stuff? A. Well, Joe asked him the names, but I don't remember now what they said they was. * * * Q. Do you remember what date Buford bought this stuff? A. No, sir. Q. Do you know about how long it was before he was

arrested? A. I believe he bought it on Saturday, and on the following Monday he was arrested."

On cross-examination the witness testified in part as follows:

"Q. You and Cicero are pretty good friends, are you? A. Yes, sir. Q. What kind of looking white man was that? A. I don't remember. Q. Was he a big or a little man? A. A pretty good sized man. Q. Can you tell how he was dressed? A. No, sir. Q. What kind of a negro? A. Just a black negro."

C. E. Buford, a witness for the defendant, testified in part as follows:

"That he is a brother of the defendant and lived about 12 miles southeast of Bartlesville; that he remembered of the arrest of Cicero Buford on this charge; that he and Cicero had some doors and sash out at his place at the time Cicero was arrested; that when they sold the home place they had some buildings out there that were torn down, and they had been hauling the doors, etc., around to keep from thowing them away, and had stored it on the farm; that this property belonging to Cicero as much as it did to anybody else."

Rebuttal.

Clyde Eakin was called in rebuttal by the state and testified that the defendant did not tell Mr. Creed in the conversation just before he was arrested that "if you will give me time, I will go with you and show you where I got those things."

George, Campbell & Ray, for plaintiff in error.

George F. Short, Atty. Gen., and Baxter Taylor, Asst. Atty. Gen., for the State.

MATSON, P. J. (after stating the facts as above). The sole assignment of error is that the evidence is insufficient to

sustain the verdict and judgment. For such reason we have considered it advisable to quote copiously from the testimony given by the witnesses for both the state and the defendant.

Counsel for defendant contend that the circumstances of recent possession, coupled with an untruthful statement or an evasive statement by defendant of the length of time he had been in possession of the stolen property, should not have resulted in his conviction.

We believe counsel overlooked other incriminating circumstances which the jury doubtless considered in reaching a verdict of guilty in this case. Here we have, according to the state's evidence, not only undisputed proof of the corpus delicti of the larceny, coupled with proof of possession by defendant of the stolen property two days after the larceny thereof, and an admitted untruthful statement by defendant at the time he was first found in possession thereof, but also the circumstances that at the time defendant asked for a continuance of the trial he made an affidavit that he came into possession of this property on a date prior to the time it was stolen, and again as a witness in the trial he swore to matters that were contradictory both of his affidavit for a continuance and to his statement made at the time he was first found in possession of the stolen property.

We have here, then, three distinct statements by defendant, two of them under oath, and each contradictory of the other, in explanation of his possession of this stolen property. The last explanation, given at the trial, is unreasonable and apparently unbelievable. The property stolen was not such as passes readily from hand to hand. It was not such as a person would likely steal unless he had beforehand located a market for it or had a particular use to which it could quickly be put.

Here defendant was building a house; he needed just two doors and five windows and screens. Just at the appropriate time, a negro and a white man in a spring wagon made a convenient appearance hauling just two doors and five windows and screens. Defendant says he bought these windows and doors and screens from the negro for $35, a little more than half of their actual value. Defendant did not learn the true names of and could not afterwards locate either of these parties, although the case was not tried for several months. Defendant says this negro told him he had bought this property at a bargain from some parties south of Bartlesville who were remodeling their property by putting in heavier fixtures, yet defendant admits he made no effort to learn the names of such parties or to verify the truthfulness of the negro's statement.

The onus of proving the truth of his explanation is upon the party in whose possession stolen property is found, when found under such circumstances as to call for an explanation, and the explanation given is not natural and probable and not such as all reasonable minds would not differ on. Garcia v. State, 26 Okla. 209, 82 Am. Dec. 605.

Where the explanation of possession, however, is natural and probable, and satisfactorily accounts for the possession of the stolen property in such a way that all reasonable minds would arrive at the truthfulness of the explanation, then the court may as a matter of law determine the issue; otherwise this court would clearly be invading the province of the jury and would be passing upon the weight to be given to the testimony of the accused and his witnesses respecting the explanation, although the jury had seen and heard them testify and the court had not.

While it may be possible that a jury may err with regard to both the reasonableness and truthfulness of an ex-

planation, yet such an error is possible with regard to any inculpatory fact which the jury must find from the evidence in order to convict the accused.

The question here is, Is there any substantial evidence to support the findings of the jury? Without doubt there is.

The judgment is affirmed.

BESSEY and DOYLE, JJ., concur.